**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **Ocean Development Partners, LLC, et al.** | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No.:  1:21-cv-00146-JJM** |
| | **:** | |
| **W. Mark Russo** | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

## PERMANENT RECEIVER'S EMERGENCY MOTION TO DISMISS APPEAL

W. Mark Russo, Esq. (the "Receiver"), in and only in his capacity as the duly appointed Permanent Receiver of Hillside Village Condominium Association (the "Appellee"), hereby moves this Court on an emergency basis pursuant to Fed. Bank. R. App. P. 8013(d)(1) for the entry of an order sustaining the dismissal order of the Bankruptcy Court, dismissing the underlying involuntary proceedings pursuant to the abstention provisions of §305 of the Bankruptcy Code, and granting the Receiver's request for an emergency hearing as further explained herein. This motion seeks to uphold the Bankruptcy Court's well-founded decision to abstain from Ocean Development Partners, LLC's ("ODP" or "Appellant") effort to enlist the Bankruptcy Court in its efforts to derail the Receivership process.

In support thereof, the undersigned respectfully represents to the Court as follows.

### Introduction and Summary

The filing of the instant appeal (the "Bankruptcy Appeal") marks ODP's most recent foray into a fifth different Court in an effort to thwart a robust marketing and sale process carried out over ten (10) months, through a Rhode Island State Superior Court ("Superior Court") supervised Receivership process which is at the verge of culminating with a closing on the sale of the Receivership Estate's assets. In maneuvering between several courts, the

litigation tactics employed by ODP have been utilized to offset litigation setbacks incurred by ODP in the Superior Court, as well as to devalue the assets of the development known as the Newport Beach Club, which is located at 195 Newport Harbor Drive, Portsmouth, Rhode Island (the "Newport Beach Club" or "Subject Property").

To summarize, ODP's travel among the various Courts in connection with the sale of the Newport Beach Club is as follows:

- ODP filed a pre-Receivership lawsuit against Velocity NBC, LLC, owner of the Newport Beach Club, in the matter captioned as: *Ocean Development Partners, LLC v. Velocity NBC, LLC, et al.*, C.A. No.: PC-2020-02496, seeking among other relief, the return of a deposit allegedly paid in connection with a pre-petition Purchase and Sale Agreement;

- Participation in the claim and sale process in the underlying Superior Court supervised Receivership proceedings over the course of approximately ten (10) months in the matter captioned as: *Jennifer L. Tinsman v. Velocity NBC, LLC, et al.*, C.A. No.: NC-2020-0123 (the "Receivership Proceedings");

- Unhappy with the Superior Court's decision that ODP was not the winning bidder for the Newport Beach Club, ODP filed an appeal of the Superior Court Sale Order to the Rhode Island Supreme Court (the "Sale Order Appeal");

- In connection with the Sale Order Appeal, the Superior Court ordered ODP to post a bond in the amount of the $9.15M sale price for the protection of the parties pending the outcome of the Sale Order Appeal. On the eve of its bond obligation

coming due, ODP sought to avoid its bond obligation and filed five (5) involuntary

bankruptcy petitions in the Bankruptcy Court[1];

- In parallel with filing the five involuntary bankruptcy petitions in the Bankruptcy Court, ODP filed suit against the Superior Court approved buyer, Diamond Residences, LLC ("Diamond" or "Buyer"), its lender, and various third parties in the Massachusetts Superior Court in the matter captioned as: *Ocean Development Partners, LLC, a Massachusetts LLC, et al. v. Dmtry Deych, [sic] et. al*; C.A. No.: 2184CV00572 (the "Massachusetts Litigation");

- Then, after the Bankruptcy Court summarily dismissed ODP's involuntary filings upon motion of the Receiver, ODP, electing yet again another State Court remedy, appealed the Bond Order from the Superior Court to the Rhode Island Supreme Court (the "Bond Order Appeal"). The Receiver immediately provided notice to ODP's counsel pursuant to R.I. Sup. Ct. R. Civ. P. 11 that the Bond Order Appeal was not filed in accordance with Rule 7 of the Supreme Court Rules of Appellate Procedure. Upon realizing its misstep, counsel for ODP dismissed the Bond Order Appeal; and

- Notwithstanding opting to seek relief in the State Court on several occasions, ODP filed the instant Bankruptcy Appeal in connection with the Bankruptcy Court's Dismissal Order (the "Dismissal Order"). A true and accurate copy of the Dismissal Order is attached hereto and incorporated herein as ***Exhibit A***.[2]

---

[1] The Newport Beach Club is associated with several involuntary petitions that were filed in the Bankruptcy Court in the matters identified as: Velocity NBC, LLC Docket No. 1:21-bk-10186; TNBC Master Condominium Association Docket No. 1:21-bk-10187; TNBC Beach Village Condominium Docket No. 1:21-bk-10185; TNBC Hillside Village Condominium Docket No. 1:21-bk-10184; TNBC Beach Club, LLC Docket No. 1:21-bk-10188 (collectively the "Bankruptcy Proceedings").

[2] Prior to filing the instant Motion, the Receiver has communicated and provided the Appellant with ample time to

## Factual and Procedural History

1. On or about May 5, 2020, W. Mark Russo, Esq. was appointed as Temporary Receiver for the Subject Property and the Newport Beach Club.

2. Thereafter, on or about June 15, 2020, W. Mark Russo, Esq. was appointed as Permanent Receiver for the Subject Property and the Newport Beach Club.

3. Subsequent to the Receiver's appointment, the Receiver undertook efforts to assess the status, location and condition of the Estate's assets.

4. Based upon the Receiver's diligence, the Receiver determined that the Estate's assets primarily consisted of the Subject Property and associated development and amenities known as the Newport Beach Club.

5. Initially, the Receiver undertook steps to stabilize and protect the Newport Beach Club, including:

   a. Securing and transitioning banks accounts;

   b. Retention of a property manager, onsite security, and bookkeeping services;

   c. Establishing a resident unit owners committee during the term of the Receivership Proceedings;

   d. Developing and implementing interim operating budgets for the condominium development as well as an amenities budget[3];

---

consider the Receivership Estate's position that it intends to seek recovery of the Estate's fees and expenses in connection with the meritless nature of the filing made in the instant matter. However, the Receiver is acutely aware of the necessity of proceeding to a closing on the pending sale to protect the interests of creditors and other interested parties. In turn, the Receiver would like to first attend to completing the sale and reserve his rights to return to the issue of attorneys' fees and possibly, damages, if the Court ultimately deems appropriate.

[3] To fund the declarant's portion of the condominium and amenities budget, the Receiver was obliged to borrow $100,000.00 on a post-petition basis from III CRE Bridge Loan Fund L.P. ("CRE"), the secured creditor of the Estate's assets, which post-petition said loan has been afforded administrative priority status in the Receivership

e. Re-opening pool, tennis, and beach club amenities in the interest of Unit Owners and to enhance marketing efforts;

f. Implementing management and maintenance of the pool, tennis, and beach club amenities associated with the Newport Beach Club;

g. Developing and implementing a Court-approved Covid-19 operating plan, which has been submitted to the Rhode Island Department of Health[4]; and

h. Communicating with Town Officials in connection with the prior approvals for the Newport Beach Club in coordination with the Receivership sale process.

6. In turn, the Estate undertook to market the Subject Property. Initially, the Estate gathered historical documentation (licenses, agreements, approvals, plans, title reports, consultants' reports, etc.). As part of these efforts, the Receiver coordinated to retrieve historical documentation regarding the prior approvals for the condominium development.

7. Thereafter, the Receiver engaged in discussions with previously interested parties to determine whether any of those parties would be interested and capable of making a stalking horse offer, subject to competitive bidding to acquire the Subject Property.

8. From there, three (3) parties expressed an interest in putting forth a stalking horse bid to acquire the Subject Property.

9. Through further discussions, two (2) of those parties sought to put forth a stalking horse bid. In turn, the Receiver prepared Purchase and Sale agreements for those two (2) parties.

Proceedings.

[4] The Rhode Island Department of Health conducted a Covid-19 randomized inspection of the Development and associated amenities at the end of the Summer 2020 season, which the Receivership passed as a result of the protocols implemented during the Court-supervised proceedings.

However, neither of those two (2) parties presented the Receiver adequate proof of funds to allow the Receiver to move forward with presenting a stalking horse bid.

10. Importantly, one of the bidders that failed to provide evidence of funding was ODP. In fact, ODP submitted a Purchase and Sale Agreement in the amount of Ten Million and 00/100 Dollars ($10M) to the Estate along with a personal deposit check in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000). The Receiver expended substantial time attempting to procure the stalking horse bid from ODP. Upon receipt of ODP's Purchase and Sale Agreement, the Estate indicated that it intended to remit the deposit check into the Receivership Estate's banking account and submit the bid to the Receivership Court for consideration. **However, ODP instructed the Receivership Estate not to proceed in cashing the $500,000 deposit check**. Considering ODP's reversal of course as a stalking horse bidder, the Receiver then sought to expose the Subject Property to the marketplace to pursue the highest and best bid to purchase the Subject Property.

11. In furtherance of these efforts, the Receiver engaged a vendor and coordinated to populate an electronic data room to allow interested parties to view an abundance of diligence materials and permit those parties to put forth their best offer to acquire the Subject Property. In turn, the Receiver provided bidders with a form of confidentiality agreement to access the electronic data room.

12. During this part of the marketing process, at least thirty (30) separate entities requested and received access to the electronic data room.

13. Further, in addition to diligence materials, the Receiver also prepared a form of Purchase and Sale Agreement, which was placed in the data room.

14. Moreover, to further advertise the development opportunity, the Receiver engaged with a local vendor to prepare an aerial online video tour of the Newport Beach Club development site, which highlights both the onsite development opportunity, as well as the surrounding features that complement the Newport Beach Club development.

15. In addition, the Receiver engaged with Northeast Engineering on a time and material basis to assist the Receivership in answering diligence questions and providing potential bidders with information, and prior plans and documents regarding the Newport Beach Club development.

16. Further, the Receiver, with the Superior Court's approval, engaged the real estate brokerage firm of Cushman & Wakefield/Hayes & Sherry ("CWHS"), with offices in Providence, Rhode Island.[5]

17. CWHS is a premier real estate services firm with more than 11,000 employees operating in sixty-nine (69) countries, giving them local, regional, national and international coverage.

18. One of the principal reasons the Estate proceeded in this direction is that CWHS has experience marketing and selling properties similar to the Newport Beach Club. Specifically, CWHS previously sold 108 acres of waterfront land to Starwood Capital for the development of The Village at Mt. Hope Bay in Tiverton, Rhode Island. In turn, CWHS was retained by Starwood Capital to sell the remaining land parcels and development rights at that property. CWHS was ultimately successful in that undertaking.

19. To further market the Development to its universe of potential bidders, the Receiver coordinated with CWHS to develop a detailed offering memorandum which explained

---

[5] Pursuant to the agreement approved by the Superior Court, CWHS is due and owing a commission in connection with the Court-approved sale to Diamond.

the development opportunity by way of units that are declared and ready for development and units which could be declared and ultimately developed.

20.     The memorandum was directly distributed to all potential bidders in the marketplace expressing an interest in the development opportunity. Moreover, the development was directly marketed to 9,357 local, regional, and national investors/developers through the combined efforts of CWHS and the Receiver.

21.     In addition to directly marketing the Subject Property to regional and national developers, CWHS also utilized its network to advertise the Subject Property to over 90,000 real estate investors throughout North America.  Further, CWHS advertised the property on several websites    including    www.hayessherry.com,    www.costar.com,    www.loopnet.com, www.crexi.com, and www.linkedin.com.  Those advertisements were viewed by over 6,000 parties.

22.     After providing an opportunity for the marketplace to conduct diligence into the marketing materials, the Receiver, after consulting with CWHS, scheduled a call for offers for October 23, 2020. To assist potential offerors in advancing a bid, the Receiver provided bidders with a template bid document.

23.     In turn, the Receiver was presented with four (4) competing offers to purchase the Subject Property and associated development.

24.     Thereafter, the Receiver undertook efforts to engage in communications with the four (4) offerors to further discuss their offers and contingencies contained within those offers. Further, the Receiver undertook to explain the Receivership process to each offeror and explained that each offer was subject to higher and better bids at the sale hearing and proof of funds.

25. Two of the petitioners in the underlying involuntary bankruptcy petitions, ODP and Titan Funding, LLC, (in conjunction with a subsidiary of Toll Brothers, Inc.) submitted offers to the Receivership Estate.

26. Following this, the Receiver secured a November 12, 2020 in person hearing date before the Business Calendar to allow the sale hearing to move forward.[6] In turn, the Receiver sent out detailed emails to each of the offerors again outlining the Receivership sale process, informing them of the hearing date, the requirement to provide proof of funds in order to qualify as a bidder, and reiterating that any offers were subject to higher and better bids at the sale hearing and ultimate Court-approval.

27. The Receiver also prepared and provided each offeror with a form of Purchase and Sale Agreement that provided an opportunity for each bidder to outline any contingencies.

28. In turn, the Receiver performed diligence as to each offeror's ability to close at the level of their bid and perhaps, higher if competitive bidding increased the Initial Offer.

29. In anticipation of the Sale Hearing, the Receiver determined that the offer from Newport Beach Club, LLC for the sum of Six Million and 00/100 Dollars ($6,000,000.00) (the "Initial Offer"), was the highest and best initial bid. The Initial Offer had several associated contingencies, which at the time were acceptable to the Receiver, subject to higher or better bids at the Sale Hearing.

30. Based upon the Initial Offer, on or about October 30, 2020, the Receiver submitted a Petition to Sell recommending approval of the Initial Offer, subject to higher or better bids at the scheduled November 12, 2020 Sale Hearing.

---

[6] The Receiver also coordinated with the Superior Court to provide bidders the opportunity to competitively bid through Zoom or WebEx if a bidder could not attend the bidding in person due to Covid-19 restrictions.

31.     At the conclusion of competitive bidding at the Sale Hearing, the Receiver presented to the Court for consideration of approval the highest and best offer advanced during the competitive bidding process by Diamond in the amount of Nine Million One Hundred Fifty Thousand and 00/100 Dollars ($9.15M). The Receiver also identified several backup bids if Diamond failed to close.

32.     ODP submitted a backup bid subject to a financing contingency of $9.2M. In addition, the Receiver identified the secured creditor, CRE, as a back-up bidder pursuant to a credit bid in the amount of $7.95M of its Court-approved claim and a cash component of $1.1M to cover administrative expenses of the Receivership Estate.[7] The Receiver recommended that if Diamond did not close in accord with its offer, that the Receiver be authorized to close with the secured creditor, CRE, without further instruction. At the Sale Hearing, ODP argued that it should be deemed the preferred back-up bid despite its failure to provide proof of funds. The Superior Court, however, ordered that the Receiver should seek instructions if Diamond did not close.

33.     The Superior Court entered a Sale Order approving Diamond's bid on or about November 25, 2020.

34.     On or about December 16, 2020, ODP filed an appeal of the Sale Order to the Rhode Island Supreme Court by way of the Sale Order Appeal. ODP never sought a stay of the Sale Order from the Superior and/or Supreme Court pending the outcome of the Sale Order Appeal.

35.     Initially, the Sale Order Appeal was referred to the Supreme Court Mediation Program. In turn, the matter was not docketed by the Supreme Court. Mediation Statements were

---

[7] As a result of the delay and legal wrangling caused by ODP's litigation tactics, the Receivership Estate's administrative expenses now exceed this number.

due to be filed on or before January 8, 2021. The Receivership Estate submitted its Mediation Statement in accordance with the Supreme Court's direction. However, ODP never submitted a Mediation Statement.

36. Notwithstanding the Sale Order Appeal, the Receiver worked with Diamond towards a closing on the Court-approved sale. Pursuant to the Court-approved Purchase and Sale Agreement, the closing was to occur the first week of February 2021. However, due to exigent circumstances beyond the parties' control, the parties were unable to close within said timeframe.[8]

37. In turn, the Receiver sought instructions from the Superior Court relative to the Court-approved sale. Considering the exigent circumstances, the Superior Court extended the closing date to March 9, 2021. As the Estate would incur additional administrative expenses by extending the closing date, the Superior Court imposed a Three Thousand and 00/100 Dollar ($3,000) per diem upon Diamond through the extended closing date.

38. From there, the Receiver and Diamond continued efforts towards closing on the Court-approved sale transaction. Importantly, through Court-ordered mediation, the Receiver was able to resolve a drainage easement issue associated with a neighboring development owned by Aquidneck Country Club, Inc. ("ACC"), which otherwise was an impediment to obtaining a clear title for the Subject Property and to which Diamond has consented.[9] In light of the anticipated closing, the Superior Court recently approved a compromise of the so-called ACC Easement matter. However, the filing of the bankruptcy petitions temporarily delayed the

---

[8] The principal exigency was that counsel for Diamond was diagnosed with Covid-19 and hospitalized for an extended period prior to the Court-ordered closing date.

[9] The Superior Court's November 25, 2020 Sale Order also addresses the disposition and conveyance of ACC's Ground Lease for a twenty-two (22) acre portion of the Development a/k/a the Equestrian Center, which is an affiliated amenity of the Newport Beach Club.

Receiver from effectuating the terms of the Court-approved compromise by recording the agreed upon easement agreement.

39. In addition, the Receiver and Diamond finalized the transactional documents associated with the closing, obtained a commitment from Diamond's lender that it is prepared to close subject to clear title and obtained a commitment from Diamond's title insurer that it would provide lender and buyer title policies.

40. However, title counsel advised that the title policies would have to contain an exception for the Sale Order Appeal. Through further dialogue between the Receiver and title counsel, the title insurer agreed that it would provide title free of exception relative to the Sale Order Appeal if ODP posted a bond in the amount of the Court-approved sale.

41. The Court should note that the principal issue caused by the Sale Order Appeal is that ODP was no longer seeking to be the preferred back-up bidder as it argued to the Superior Court. Rather, ODP's appeal asserts that it should have been the Court-approved buyer over Diamond, notwithstanding its failure to provide proof of funds.

42. Therefore, on or about January 12, 2021, the Receiver filed a Motion with the Superior Court requesting an order requiring ODP to post a bond (the "Motion to Post Bond") in the amount of $9.15M for the protection of the parties. Thereafter, on or about January 20, 2021, the Superior Court heard initial arguments in connection with the Motion to Post Bond. At the conclusion of the January 20, 2021 hearing, the Court reserved ruling on the Motion and authorized the Receiver to reschedule a continued hearing on the Motion, if necessary, in connection with the Court-approved sale process.

43. Upon confirming with title counsel the protocols required for the insurer to issue title in connection with the Appeal, the Receiver renewed the Motion to Post Bond, which was heard on March 1, 2021.

44. On or about March 5, 2021, the Court issued a Decision approving the Motion and requiring ODP to post a bond in the amount of $9.15M on or before 4:00 p.m. on March 12, 2021 for the protection of the parties pending the outcome of the Appeal.[10]

45. Then, after suffering litigation setbacks in the Superior Court and on the eve of ODP's obligation to post the bond, ODP engaged in forum shopping to try to take advantage of the Automatic Stay protections afforded by the Bankruptcy Code by filing five (5) involuntary petitions in the Bankruptcy Proceedings.[11]

46. In doing so, ODP and Titan failed to alert the Bankruptcy Court in its petitions that there were associated insolvency proceedings that were well advanced before the Superior Court, let alone provide any indication that ODP was subject to pending orders in the Superior Court.

47. Interestingly, ODP simultaneously sued Diamond, its principal, its lender, and various other parties in Massachusetts Superior Court alleging very poorly pled "RICO" claims, while it sought the Bankruptcy Court's protection. This is yet another example of the Fiorillo-associated parties' forum shopping in an attempt to interfere with the Court-approved sale process and taint the value of the Estate's assets.[12]

---

[10] The Superior Court entered a corresponding Order dated March 8, 2021 requiring ODP to post said bond.

[11] While the filing of the involuntary petitions did not automatically trigger the Bankruptcy stay, it created an additional, potential cloud on title, thereby effectively staying and preventing the Court-approved sale from proceeding to a closing.

[12] Nicholas Fiorillo is the principal of ODP. He also asserted that he, personally, and Appian Way 54, LLC, another entity in which he is a principal, were creditors of the five debtors involuntarily petitioned into bankruptcy.

48. Thereafter, on or about March 17, 2021, the Receiver filed a Motion to Dismiss in the Bankruptcy Proceedings and, based upon the above extenuating circumstances, requested an Emergency Determination of said Motion. A true and accurate copy of the Receiver's Memorandum in Support of the Motion to Dismiss is attached hereto and incorporated herein as *Exhibit B*.[13] In accordance with the Local Rules, the Receiver's counsel conferred with ODP's counsel in advance of filing the Motion and confirmed that there were no timing issues or constraints in proceeding with the Emergency Motion.

49. Subsequently, the Bankruptcy Court scheduled an emergency hearing on the Motion to Dismiss which occurred on March 22, 2021. Approximately an hour before the hearing, ODP filed Emergency Motions requesting to schedule an evidentiary hearing on the Receiver's Motions and a Motion (1) appointing Interim Trustees; (2) to set bond; and (3) for leave to tender the stalking horse offer ("Stalking Horse Offer").[14]

50. The Bankruptcy Court proceeded with a hearing on both ODP's and the Receiver's Motions. A true and accurate copy of the transcript from the consolidated hearing is attached hereto and incorporated herein as *Exhibit C*.[15]

51. At the conclusion of the hearing on the Motion, the Bankruptcy Court denied ODP's Motion for an evidentiary hearing, as well as its Motion (1) appointing Interim Trustees; (2) to set bond; and (3) for leave to tender the Stalking Horse Offer. A true and accurate copy of the Order denying ODP's Motion is attached hereto and incorporated herein as *Exhibit D*.

---

[13] The Receiver filed identical Memoranda in support of the Motions to Dismiss in each of the Bankruptcy Proceedings.

[14] Despite the Receiver conferring with ODP's counsel on several occasions prior to filing the Receiver's Motions to Dismiss in Bankruptcy Court, ODP failed to make any good faith effort to either inform Receiver's counsel of its Emergency Motions or to confer on its Motions in accordance with the Local Rules.

[15] The Bankruptcy Court held a single, consolidated hearing on all the Motions to Dismiss, as the issues and requested relief were identical in each matter.

52. In turn, the Bankruptcy Court granted the Receiver's Motion to Dismiss, decided that abstention was appropriate under 11 U.S.C. § 305(a), and entered the Dismissal Order.

53. In the Bankruptcy Court's Bench Decision, the Court repeatedly indicated to ODP that one of the main reasons the Bankruptcy Court was abstaining from exercising jurisdiction was the fact that ODP had already elected to pursue its remedies in State Court (for some ten months) and that allowing the involuntary proceedings to proceed in parallel would only serve to undermine a well-established and nearly completed Receivership process in which ODP had remedies to preserve its appellate rights in State Court. *See Tr. 55:10-18; and Tr. 59:9-15.*

54. Rather than pursue its remedies in State Court, that very same day ODP filed the instant Bankruptcy Appeal with the Bankruptcy Appellate Panel. Subsequently, upon docketing of the instant Bankruptcy Appeal, the Receiver elected to move the Bankruptcy Appeal matter to this Court for consideration.

55. Thereafter, on or about March 25, 2021, electing yet again another State Court remedy, ODP appealed the Bond Order from the Superior Court to the Rhode Island Supreme Court in the Bond Order Appeal matter.

56. Moreover, post-dismissal of the Bankruptcy Proceedings, on or about March 24, 2021, the Receiver filed a Motion to Dismiss the Sale Order Appeal based upon ODP's failure to post a bond in accordance with the Superior Court's earlier Bond Order. Thereafter, the Superior Court held a hearing on March 31, 2021 on the Motion to Dismiss, at the conclusion of which the Superior Court granted the Receiver's Motion and dismissed the Sale Order Appeal.

57. A true and accurate copy of the Order dismissing the Sale Order Appeal is attached hereto and incorporated herein as ***Exhibit E***. ODP also stipulated to said dismissal. A true and accurate copy of said Dismissal Stipulation is attached hereto and incorporated herein as

15

***Exhibit F***.  Thus, the only remaining matter involving the Receivership Proceeding is ODP's appeal of the Bankruptcy Court's abstention and Dismissal Order.

## Standard of Review

A Bankruptcy Court's decision to dismiss a bankruptcy case pursuant to 11 U.S.C. § 305(a) is generally reviewed for an abuse of discretion. *In re Efron*, 529 B.R. 396, 404-405 (B.A.P. 1st Cir. 2015). In turn, any factual findings relied upon by the Bankruptcy Court in exercising its discretion are reviewed under a clearly erroneous standard and any legal conclusions relied upon by the Bankruptcy Court are subject to plenary review. *Id.*

The Bankruptcy Court, however, has broad discretion to determine whether either conversion or dismissal is in the best interests of creditors and the estate. *Id*. A court only abuses its discretion if it does not apply the correct law or if it rests its decision on clearly erroneous findings of material fact. *Id*.

As set forth below, the Bankruptcy Court applied the correct analysis in deciding to abstain from exercising jurisdiction pursuant to Bankruptcy Code §305(a). Further, the facts applied to the Bankruptcy Court's analysis were undisputed based upon the procedural history of the underlying Receivership Proceedings, of which the Bankruptcy Court properly took judicial notice, and which ODP acknowledged on the record at the hearing before the Bankruptcy Court.

## Legal Argument

### I.  Appellants Are Not Entitled to an Evidentiary Hearing

The law is well settled that an evidentiary hearing is not a necessary precursor to the Bankruptcy Court abstaining from exercising its jurisdiction pursuant to Bankruptcy Code §305(a) where the arguments before the court and a record have been sufficiently developed to allow the Bankruptcy Court to make an informed decision. *Id. At 408-409*.

In the instant matter, ODP had ample opportunity to present to the Bankruptcy Court any arguments, evidence, or other information that it thought relevant to the Motion to Dismiss. Moreover, in denying ODP's Motions, the Court noted ODP's prior opportunities to vet its gripes with the Superior Court sale process during the ten (10) month Receivership Proceedings and as part of the Sale Order Appeal.

Further, the Court indicated and ODP acknowledged that ODP had at least ten (10) days to anticipate a hearing on the Motion to Dismiss by which to present any information or arguments that it thought relevant to the Bankruptcy Court's consideration of the Receiver's Motion to Dismiss. *Tr. 43:20-25; Tr. 44:1-4.* In other words, ODP very clearly knew the involuntary petition would be heavily disputed and challenged and had every opportunity to prepare for said challenge and present its arguments.

As stated above, in reaching its decision to abstain, the Bankruptcy Court took judicial notice of several undisputed procedural facts from the underlying Superior Court and Supreme Court proceedings including:

(1)     The Receivership Proceedings were commenced approximately ten (10) months prior to the filing of the involuntary petitions;

(2)     The Superior Court proof of claims deadline passed, ODP had participated in that claims process, and the claims process was well underway;

(3)     The Superior Court had approved a sale of the Newport Beach Club's assets in a proceeding in which ODP voluntarily participated;

(4)     ODP had taken an appeal of the Order approving the sale to the Supreme Court;

(5)     The Superior Court ordered ODP to post a bond in the amount of $9.15M for the protection of the parties pending ODP's Sale Order Appeal; and

(6)     The Appellants filed the involuntary petitions on the eve of ODP's obligation to post the bond with the Superior Court, and ODP did not post the bond.

*See Tr. 9:12-22; Tr. 10:13-14; Tr. 28:14-25; Tr. 29:1-6; and Tr. 55:2-18.*

Moreover, the Bankruptcy Court inquired of ODP's counsel several times to elaborate what would be accomplished by way of deferring the Motion and conducting a further evidentiary hearing, independent from the hearings that already had taken place at the Superior Court.[16] *See Tr. 14:21-25; Tr. 15:1-6; Tr. 17:6-12; and Tr. 18:1-25*. The only explanation that ODP's counsel provided was that ODP had concerns with the legitimacy of the sale process conducted at the Superior Court auction process. *Tr. 17:22-25*.

In turn, the Bankruptcy Court determined that an evidentiary hearing would not be appropriate under those circumstances. Rather, the proper procedure for ODP to follow would be to pursue its remedies in the State Court appellate process before the Superior and/or Supreme Court. *Tr. 34:17-25; and Tr. 35:1-11.*

In its Bench Decision, the Bankruptcy Court specifically stated as follows:

So there's no reason that I can't decide that today based on facts that are before me that aren't disputed, which is the course of the proceeding in the receivership estate, Judge Licht's decision not to allow bidding to be reopened by your client once it was approved, and you have your remedies in state court to go before Judge Licht to say, gee, since February, this hasn't closed, you should reopen it. That's the issue.

There has been ten months pending in the state court where they're at the pinnacle of the achievement, which is a sale, and if you think it's not going forward fast enough, or your client wants to stop it, you have your remedies in state court, and this tactic of coming here to bypass the state court, bypass posing an appeal, and you have a pending appeal, and you have lawsuits in other -- in another Rhode Island Superior Court case and in a Massachusetts case, it just doesn't sit right, number one.

*See Tr. 55:2-18.*

---

[16] The Receiver provided the Bankruptcy Court with transcripts of pertinent Receivership Proceedings in the Receiver's Memorandum in Support of the Motion to Dismiss.

In fact, in taking judicial notice of the determinations made in the Receivership Proceedings, the Bankruptcy Court acknowledged the legitimacy of the well-established Superior Court sale process in stating:

> And I got to tell you, every single court believes that in order to protect sales and have people make their highest and best offers at auctions -- you know, after aggressive marketing, you got to have an end. Because if a bidder can come back the next day or an hour later, you never have an end, and it undermines the entire sale process whether it's by a state court or a bankruptcy court.

*See Tr. 34:17-24.*

Importantly, the Bankruptcy Court did not reach any of the other grounds for relief set forth in the Receiver's Motion as the Bankruptcy Court first addressed the undisputed facts relative to the procedural history of the Superior Court and Supreme Court proceedings and whether abstention under §305(a) was appropriate. In fact, the Bankruptcy Court recognized that the other grounds for relief set forth in the Receiver's Motion to Dismiss would have necessitated a separate evidentiary hearing and thus confined its review and analysis in the first instance to determine whether abstention under §305(a) was appropriate.[17] Thus, the appeal should be dismissed.

## II. <u>The Bankruptcy Court's Decision to Abstain Should Be Sustained</u>

It is beyond dispute that the Court's application of Bankruptcy Code §305(a) and the analysis of the factors set forth in the matter of *In re Fax Station, Inc.,* 118 B.R. 176 (Bankr. D. R.I. 1990) ("*Fax Station*") was the applicable law to be applied to the Receiver's request for the Bankruptcy Court to abstain from jurisdiction. In turn, during oral argument the Bankruptcy Court analyzed the applicability of each of the *Fax Station* factors relative to the Receiver's request for the Bankruptcy Court to abstain jurisdiction. Thus, the Receiver

---

[17] The Receiver also sought dismissal of the petitions, *inter alia*, on the basis that the petitioning creditors were not proper creditors and that their claims were not undisputed.

suggests that the Bankruptcy Court applied the correct legal principles and analysis in declining jurisdiction and dismissing the petition.

Further, in the Bench Decision, the Bankruptcy Court specifically referred to the applicability of many of the *Fax Station* factors weighing in favor of abstaining from jurisdiction. In doing so, one of the factors that the Court focused its analysis was the purpose of the bankruptcy filing. It is well settled that a significant factor in favor of dismissing a case pursuant to §305(a)(1) is the absence of a true bankruptcy purpose. *Id.; See Also In re Efron*, 529 B.R. 396, 406 (B.A.P. 1st Cir. 2015).

In its assessment, the Bankruptcy Court focused on the fact that the Appellant had failed to demonstrate any legitimate bankruptcy purpose for the involuntary filing. *Tr. 55:19-25; and Tr. 58:6-12*. In fact, the Bankruptcy Court found that the purpose of the filing based upon ODP's arguments was to simply disrupt the sale process in the Receivership Proceedings. *Tr. 56:1-20; and Tr. 59:9-15*.

In reaching its Decision, the Bankruptcy Court stated:

And I just --- I think you're undermining the integrity of the sale process. And you have a forum that your clients engaged in, your clients participated in, and they don't like the results, so they're looking for another forum to get a different result. And that's exactly what abstention is for. I think this case -- this really cries out for abstention here.

*See Tr. 59:9-15.*

In addition, it is beyond dispute that the Bankruptcy Court took judicial notice of the underlying procedural history of the ten (10) month Receivership Proceedings as set forth in the Superior Court's Decision on the bond matter. *Tr. 9:12-22*. Importantly, ODP did not dispute the procedural history of the Receivership proceedings. Rather, ODP took issue with

the sale process itself, the very thing upon which its then-pending Supreme Court appeal was based.

In turn, dismissal is appropriate if the interest of creditors and the debtor would be better served by dismissal because no useful or beneficial purpose would likely be achieved for the debtor in a Bankruptcy Court proceeding and the debtor would bear substantial expenses the longer the case lasted. *See In re Efron*, 529 B.R. 396, 406 (B.A.P. 1st Cir. 2015). In the instant matter, the Bankruptcy Court found that there was no legitimate purpose to the filings and that no better outcome would likely be achieved in the Bankruptcy Proceedings. *Tr. 66:8-15*.

Rather, the only interest served would be ODP's. On the other hand, the Estate would continue to accrue administrative expenses and leave a Chapter 7 trustee without sufficient operating funds to operate, market, or sell the assets; while assuming the risk that the result of starting a new "mirror image" marketing and sale process in bankruptcy may well lead to a detrimental result for creditors of the Estate.

Under those circumstances, the Bankruptcy Court exercised its discretion and abstained from exercising jurisdiction. The Bankruptcy Court's application of the procedural history of the Receivership Proceedings and ODP's election to pursue its State Court remedies in connection with its dispute as to the Receivership sale process is not a clearly erroneous application of the undisputed facts in this matter. In fact, it is the exact result that the Bankruptcy Court correctly noted the case "cried out" for. Consequently, the Bankruptcy Appeal should be dismissed.

In addition, since the entry of the Dismissal Order by the Bankruptcy Court, ODP yet again exercised its State Court remedies by filing the Bond Order Appeal. It is well settled

that failure to make a timely assertion of a right is grounds for dismissal based upon the doctrine of equitable mootness. *See In re Fin. Oversight & Mgmt. Bd.*, 989 F.3d 123 (1st Cir. 2021).

In the instant matter, ODP waited ten (10) months after the Receivership Proceedings commenced before attempting to seek relief from the Bankruptcy Court. Then, after suffering litigation setbacks in the Superior Court and then with further setbacks after the Bankruptcy Court's dismissal of the Bankruptcy Proceedings, ODP elected yet again to pursue its State Court remedies by way of filing the Bond Order Appeal.

Apart from dismissal of the instant Bankruptcy Appeal based upon the Bankruptcy Court's proper exercise of abstention, the Receiver suggests that dismissal is also appropriate pursuant to the doctrine of equitable mootness. Thus, the instant Bankruptcy Appeal should be dismissed.

### Conclusion

WHEREFORE, for the foregoing reasons, the Receiver respectfully requests that this Court hear this matter on an emergency basis and make a determination as follows:

1. Granting the Receiver's Motion;

2. Sustaining the Bankruptcy Court's Dismissal Order; and

3. Awarding any and all other relief the Court deems necessary and just.

Respectfully submitted,

W. Mark Russo, Esq., In and Only In
His Capacity as Permanent Receiver

By His Attorneys,

*/s/John A. Dorsey*
John A. Dorsey, Esq., (#8373)
Ferrucci Russo, P.C.
55 Pine Street – 4th Floor
Providence, RI  02903
Tel:     (401) 455-1000
Dated: April 13, 2021                Email: jdorsey@frlawri.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April, 2021, the foregoing document has
been filed electronically through the Rhode Island ECF system, is available for viewing and
downloading, and will be sent electronically to the counsel who are registered participants
identified on the Notice of Electronic Filing.

Gary L. Donahue - ustpregion01.pr.ecf@usdoj.gov
John A. Dorsey , Jr. - jdorsey@frlawri.com; rsibielski@frlawri.com
Shawn M. Masterson - smasterson@sdmlawgroup.com
William Mark Russo - mrusso@frlawri.com; wsmith@frlawri.com


## Manual Notice List

The following is the list of attorneys who are not on the list to receive e-mail notices for
this case (who therefore require manual noticing). I further certify that on the 13th day of April,
2021, I have sent via Federal Express, pre-paid mail, the instant document to the following:

| | |
|---|---|
| Thomas A. Hanley, Esq. <br> The Westin Providence Dome Bldg, <br> 3rd Fl. <br> 1 West Exchange Street <br> Providence, RI 02903 | Neil Kreuzer, Esq. <br> Law Office of Neil Kreuzer <br> 268 Newbury Street, 4th Floor <br> Boston, MA 02116 |
| William M. Dolan, Esq. <br> Nicholas L. Nybo, Esq. <br> Danielle E. Dufault, Esq. <br> Adler Pollock & Sheehan, PC <br> One Citizens Plaza, 8th Floor <br> Providence, RI 02903-1345 | Steven J. Boyajian <br> Robinson & Cole LLP <br> One Financial Plaza, 14th Floor <br> Providence, RI  02903 |
| | |

| | |
|---|---|
| James G. Atchison, Esq.<br>Darrow Everett, LLP<br>One Turks Head Place, Suite 1200<br>Providence, RI 02903 | Stephen E. Breggia, Esq.<br>395 Smith Street<br>Providence, RI 02908 |
| Stephen M. Litwin, Esq.<br>116 Orange Street<br>Providence, RI 02903 | John D. Russell, Esq.<br>49 Bellevue Avenue<br>Newport, RI 02840 |
| Mark F. Comstock, Esq.<br>FNTG<br>One State Street, Ste. 600<br>Providence, RI 02908 | Theodore Orson, Esq.<br>Giovanni La Terra Bellina, Esq.<br>Orson & Brusini<br>144 Wayland Avenue<br>Providence, RI 02906 |
| Justin T. Shay, Esq.<br>Cameron & Mittleman, LLP<br>301 Promenade Street<br>Providence, RI 02908 | Robert D. Wieck, Esq.<br>Wieck DeLuca & Gemma<br>One Turks Head Place, Suite 1300<br>Providence, RI 02903 |
| Joseph M. DiOrio, Esq.<br>Gardner H. Palmer, Esq.<br>DiOrio Law Office<br>144 Westminster Street, Suite 302<br>Providence, RI 02903 | Shawn M. Masterson, Esq.<br>Shapiro Dorry Masterson, LLC<br>145 Waterman Street<br>Providence, RI 02906 |

/s/ *John Dorsey, Esq.*